UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| V. | ) | No. 2:10-CR-05 |
| | ) | |
| ROY ROBINSON | ) | |

## **REPORT AND RECOMMENDATION**

Defendant is charged with being a convicted felon in possession of a firearm. The firearm with which he is charged with possessing, a .380 caliber semi-automatic pistol, was seized after a warrantless search of the car he was driving.

Defendant has filed a motion to suppress any evidence of that firearm, claiming that there was no probable cause to justify the search. (Doc. 17). The motion has been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636. A hearing on defendant's motion was held on March 15, 2010. After hearing the evidence, the court finds that there were several legitimate bases to support the search of defendant's vehicle, as a result of which it is recommended that defendant's motion to suppress be denied.

**FACTS**

Aubrey McElroy, an officer of the Johnson City Police Department, was on duty during the early morning hours of January 1, 2010. At 5:23 a.m., Officer McElroy had just parked his cruiser at police headquarters, located on Main Street in Johnson City. As he was standing beside his car, he heard what he believed to be six to eight gun shots, which came

from the general direction of the Bell Ridge area of Johnson City, approximately one mile from the police headquarters.[1] The Bell Ridge area is within Officer McElroy's patrol zone and he was quite familiar with it; it is a high crime area, and gun fire has occurred there before.

Officer McElroy promptly called his dispatcher to report those possible gun shots. Being intimately familiar with Bell Ridge, Officer McElroy made an educated guess that a person who had just committed a crime in that location would wish to get away as quickly as possible; that he likely would drive a car to do so; and that he would take Orleans Street to Broadway. Accordingly, as Officer McElroy left headquarters, he turned left on Main Street, headed towards its intersection with Broadway. As he neared that intersection, he saw a Mercedes vehicle proceeding northwardly on Broadway, coming from the direction of Bell Ridge. When Officer McElroy first saw the Mercedes, it appeared to be going approximately the speed limit of 25-30 miles per hour, and it was the only car on Broadway.

Officer McElroy turned left onto Broadway to follow the Mercedes. Even though Officer McElroy had not activated his blue lights or siren, or otherwise indicated his interest in the Mercedes, the Mercedes speeded up considerably after the police car got behind it, going approximately 50 miles per hour in what was then a 35 mile per hour zone. Defense counsel attempted to demonstrate through cross examination of Officer McElroy that he did not use radar, nor did he "pace" the Mercedes, to determine its speed. In other words,

---

[1] The sound of a shot of a large-caliber weapon easily will carry more than a mile, especially in the early morning hours when it is relatively quiet.

2

defense counsel attempted to show that Officer McElroy's estimation that the Mercedes was speeding away was inaccurate. With all due respect to defense counsel, even a lay person who has driven a car for a few years is capable of making reasonable estimations of the speed of another vehicle, whether that vehicle is approaching or going away, to say nothing of a trained patrol officer who spends most of his entire shift behind the wheel of a patrol car. Indeed, the video recording of the pursuit, discussed hereafter, reveals that both cars were going considerably faster than 30 miles per hour. Officer McElroy believed the Mercedes was speeding away, and the court agrees that his estimation of the vehicle's speed was accurate.

After McElroy reported to his dispatcher that he was pursuing the Mercedes, he activated his siren and blue lights. Sergeant Scott Jenkins was nearby when he first heard Officer McElroy's report of possible shots fired. Jenkins also heard Officer McElroy's radio transmissions to his dispatcher regarding his pursuit of the Mercedes on Broadway. Jenkins stopped his police car at the intersection of Myrtle and Broadway, some distance to the north beyond the Mercedes and Officer McElroy. When he looked back to the south on Broadway, he could see both the Mercedes and the cruiser with its blue lights. Jenkins activated the blue lights on his own cruiser, but remained at the intersection of Myrtle and Broadway. Jenkins, as did Officer McElroy, testified that the Mercedes was going at a high rate of speed.

When Officer McElroy activated his blue lights, the cruiser's video camera likewise activated and remained on throughout the ensuing pursuit, the stop of the Mercedes, the driver's arrest, and the subsequent search of the vehicle. As the video recording reveals, the

Mercedes did not promptly slow down and stop in obedience to the police Mercedes's siren and blue lights; rather, it proceeded to drive at the same relatively high rate of speed for some distance along Broadway until it began to slow down at the intersection of Broadway and Fairview.  Instead of stopping, the Mercedes turned right onto Fairview Avenue.  By this time, Jenkins had now joined the chase.  On Fairview, the driver gave every indication that he intended to stop by slowing and pulling to the side.  However, the Mercedes suddenly picked up speed and continued on Fairview Street until its intersection with Earl Street, at which the driver turned right.  The Mercedes continued another block, until the intersection of Earl and Millard, where the Mercedes finally stopped.

A minute and fifteen second elapsed from the time Officer McElroy turned on his blue lights and siren until the driver of the Mercedes stopped.  During that time, the Mercedes easily traveled three-quarters of a mile, perhaps more.

When the Mercedes stopped, its driver, defendant, opened the door, and then leaned out that door with both hands extended up into the air.

Understandably extremely wary due to all that had occurred, Officer McElroy focused his cruiser's spotlight on the Mercedes and defendant.  Officer McElroy got out of his cruiser, with his weapon drawn, and took up a position of relative safety behind his vehicle.  Jenkins did likewise. Officer McElroy  and Sergeant Jenkins began yelling at defendant to get out of the car.  Rather than complying with the officers' instructions, defendant remained in his car, with his hands extended to the outside.  This potentially deadly stand-off continued for precisely three minutes and thirty seconds; the officers

4

continued to yell at defendant to get out of his car, and defendant did not do so. Both Officer McElroy and Sergeant Jenkins testified that defendant had his car radio turned up extremely loud, and for that reason it was possible he could not hear their instructions. Whether defendant could hear the officers or not, his obstinance in remaining in his car defies logical explanation. He knew that two officers were yelling something at him, blue lights were flashing, and those officers had their firearms aimed at him. Anyone with a modicum of good sense would have realized that he was in a perilous position, and would promptly have exited his car with his hands extended high above his head and in plain view. Suffice it to say that defendant's failure or refusal to exit the car for three and one/half minutes was incredibly bizarre at best, and extremely dangerous at worst.

When defendant finally did step out of his car, both Officer McElroy and Sergeant Jenkins saw a shell casing fall from defendant's lap to the pavement, and both heard it.[2] Defendant was instructed to lie face down upon the ground, and he was then handcuffed. After he was searched for weapons, he was placed in the police cruiser.

When Officer McElroy walked toward the Mercedes, the driver's side door was still ajar and Officer McElroy could see empty shell casings on the driver's floorboard and in the driver's seat. The officers then searched the entire car, finding more empty .380 caliber shell casings, a box of .45 caliber ammunition, and a .380 caliber semi-automatic handgun in the

---

[2]The officers testified that a shell casing makes a distinctive sound when it hits pavement, a sound with which they are quite familiar by virtue of their years of practice on the firing range. Although this magistrate judge has only the tiniest fraction of time on a firing range when compared to these officers, he himself is well familiar with the distinctive sound.

glove box of the car.

The slide of the handgun was locked in the open position, and the magazine was empty, an indication that the weapon had been fired until all its ammunition had been expended. Also, the weapon smelled as if it had just been fired.

Some time after the search the vehicle and the discovery of the gun and box of ammunition, the officers requested a criminal history regarding defendant and were told that he was a convicted felon.

Defendant was transported to the Washington County Detention Center.

A vehicle inventory search of defendant's vehicle was performed before it was towed from the scene.[3]

**ANALYSIS**

> *I. WAS THERE PROBABLE CAUSE TO SEARCH THE VEHICLE?*
>
> > (a) Search Incident To An Arrest Based On Probable Cause

Probable cause has been defined by the Supreme Court as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The circumstances that constitute probable cause are those that would warrant a reasonably prudent person to believe that an offense had been committed and that

---

[3]There was no testimony regarding the inventory search. Nevertheless, evidence of that inventory search is in the record. Officer McElroy's excellent and very detailed report was appended to defendant's motion to suppress, and it referred to an inventory search of defendant's car; *see*, Document 17-1. Also, the recording of the various radio transmissions of the officers revealed that McElroy had prepared a "tow ticket" before he left the scene with defendant. *See, e.g.*, Ex. 14.

evidence of that offense would be found in the place to be searched. *United States v. Beasase*, 521 F.2d 1306, 1307 (6th Cir. 1975). But must the probable cause be with regard to a specifically identified offense, or may it be a belief that a person probably committed a crime of some undetermined nature?

Admittedly, this court first assumed that any probable cause had to be with reference to a specific and described crime, but apparently that first reaction is erroneous. A case from the Second Circuit Court of Appeals is virtually identical with the situation before this court. In *United States ex rel Frasier v. Henderson*, 464 F.2d 260 (2nd Cir. 1972), the defendant and another man robbed a social club at 3:00 a.m. on a Saturday morning. The two armed robbers fled on foot. Several blocks away, two New York police officers in a patrol car, *who had heard nothing about the robbery,* saw two men running through a city park. One of the officers jumped out of his car and yelled at one of the men, who was carrying a shopping bag, to stop. The man briefly stopped, but then began to run, and the officer gave chase on foot. The officer finally caught up with the fleeing man, and observed him pushing the shopping bag behind the doors of an apartment building. The officer had his weapon pointed at the man, who demanded that the officer explain why he was chasing him. The officer finally searched the shopping bag, discovering therein a revolver, as well as the stolen loot.

The defendant filed a motion to suppress the evidence discovered in the shopping bag. The district court denied that motion on the basis that the officer's search was justifiable as incidental to the defendant's warrantless arrest which in turn was based on probable cause.

The Second Circuit affirmed. As pertinent to the case before this court, the Second

Circuit said:

> It is true, as appellant asserts, that the patrolmen did not know positively that any crime had been committed or precisely what type of crime may have been committed. But the Constitution requires neither such certainty or such specificity. What is required is that
>
>> at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man into believing that the petitioner had committed or was committing an offense.

464 F.2d at 262-3.

The Second Circuit discussed the circumstances known to the officers that ultimately led to their warrantless arrest of the defendant: it was late at night; they had heard shouts or yelling, and then had seen two men running out of a deserted park away from the yelling; one of the men was carrying a shopping bag; one of the men, after being told by the officer to stop, turned and fled. The court then stated that the defendant's attempt to hide the bag, coupled with his flight from the police, "afford[ed] a basis for significantly more than a mere suspicion that appellant had committed a serious 'offense.'" *Id*., 263. Then there is this significant language in the *Henderson* opinion:

> We recognize that even though [the officer] had reasonable cause to believe that a serious crime had been committed, he could not at the crucial moment determine precisely what crime that was - whether, for example, it was robbery, armed robbery, or burglary. *But common sense and authority suggest that this inability should not invalidate an otherwise proper arrest*.

*Id*. (Italics supplied).

The Sixth Circuit Court of Appeals has cited *Henderson* with approval. *See, e.g.,*

8

*United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991).

The *Henderson* court's reference to common sense is particularly appropriate. Here, shots were fired at 5:30 a.m. in the morning in high crime area of Johnson City. The defendant, when he observed a police car turn on the roadway behind him, fled for no apparent reason. Then, when the officer activated his blue lights and siren, defendant refused to stop. Subsequently, after giving every indication he intended to pull over and stop, defendant suddenly sped up and fled again. When he finally did stop, he put both hands into the air outside the car, suggesting even to an inexperienced observer that defendant knew that he had committed an offense, that he knew that the officers knew that he had committed an offense, and that he knew or strongly suspected that the officers believed that he was armed and dangerous. Although the facts observed by Officer McElroy in the case before this court do not precisely match those observed by the police officers in *Henderson*, the factual *substance* of both are identical.

Officer McElroy had probable cause to arrest defendant, after which the search of his vehicle as an incident to that arrest was appropriate.

(b) Probable Cause To Believe The Vehicle Contained Evidence Of The Offense

The preceding discussion focuses upon a search incidental to an arrest based on probable cause to believe that the defendant committed an unspecified crime. But there is yet another independent reason to support a search of a vehicle that is premised on probable

9

cause, and that is probable cause to believe that the interior of the car contained evidence of the offense for which defendant was, *or could have been*, arrested.

Defendant committed a Class E felony when he refused to stop in obedience to the pursuing police car's blue lights and siren, as a result of which he could have been promptly arrested, as of course he was.[4] The question then becomes, could his vehicle be searched because evidence of that offense reasonably might be found therein? *Arizona v. Gant,* 129 S.Ct. 1710 (2009), reaffirmed that a vehicle may be searched if "it is reasonable to believe [it] contains evidence of the offense of arrest." 129 S.Ct. at 1723.

Refusing to stop for a police officer is not merely a "traffic offense;" as noted, it is a felony. The reason a suspect fled the police could be relevant to his ultimate prosecution; after all, it is not for a court to tell the prosecution that it has enough evidence and is entitled to gather no more. Evidence located within the vehicle could explain to a jury *why* this defendant fled and refused to stop, which could be particularly important if defendant claims at trial (purely as an example) that he refused to stop only because he was fearful of being harmed by the pursuing officers. And it is beyond argument that it was reasonable to believe that the reason for that flight was either on his person, or in his car, or both.

*II. WAS A SEARCH OF DEFENDANT'S VEHICLE JUSTIFIED UNDER TERRY V. OHIO?*

If a law enforcement officer has a reasonable suspicion, based on articulable facts, that criminal activity has occurred or is occurring, he may stop and briefly detain a person for

---

[4]Tenn. Code Ann. § 39-16-603(b).

investigative purposes. This of course is known as a *Terry* stop. *Terry v. Ohio*, 392 U.S. 1 (1968). Similarly, if a law enforcement officer has a reasonable and articulable suspicion that an occupant of a vehicle has been involved in criminal activity, the officer may stop that vehicle for investigative purposes. *Dunaway v. New York*, 442 U.S. 200, 207 (1979); *United States v. Hensley*, 469 U.S. 221, 226 (1985).

Up until just a few months ago, there would have been no question that these officers' search of defendant's car was lawful for several reasons, including a precautionary search for weapons. But the Supreme Court's decision in *Arizona v. Gant*, *supra*, has made even a *Terry*-search under these circumstances at least debatable.

In *Gant*, the Supreme Court held that the police may search a vehicle incident to the recent occupant's arrest "only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.*, 1723. Here, the defendant was handcuffed and seated in a police cruiser at the time his vehicle was searched, and he was not "within reaching distance" of any part of his car. But the court also stated that it was not overruling prior cases which "established exceptions to the warrant requirement [that authorizes] a vehicle search under additional circumstances when safety or evidentiary concerns demand." 129 S.Ct. at 1721.

The Supreme Court earlier held in *Michigan v. Long*, 463 U.S. 1032 (1983), that the *Terry*-stop rationale extends to vehicle searches:

> [T]he search of the passenger compartment of an automobile, limited to

> those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rationale inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id.*, p. 1049.

The fact that defendant was in custody and presumably incapable of reaching a firearm within his car should be irrelevant. *United States v. Wynn,* 148 F.Appx. 471 (6th Cir. 2005) is mostly on point; although *Wynn's* facts differ from those before this court to some extent, the differences are not particularly significant. In *Wynn*, the police had received a report that shots had been fired at a residence. Police officers went to the reported address, and observed three occupants sitting in the driveway in a pickup truck. One of the occupants leaned over, and the officer could hear a clanking sound within the truck. All three of the truck's occupants were intoxicated, prompting the officers to arrest all three occupants. One of the passengers subsequently told an officer that the driver had a gun in the vehicle. The officer searched the vehicle and found a gun beneath the seat, ultimately resulting in the driver's prosecution for being a felon in possession of a firearm.

The driver filed a motion to suppress, alleging that the officers had no probable cause to arrest him and therefore the search of the truck could not be supported as incidental to his arrest. *Id.*, 474-5. The Court of Appeals held that it did not need to address the question of whether the officers had probable cause to arrest the driver because the officers had a reasonable suspicion to conduct an investigatory or protective search of the truck. *Id.*, 475.

After discussing the *Terry* factors that support an investigatory search of a vehicle, the

court pointed out that the fact that the occupants were out of the vehicle and in the process of being arrested did not vitiate the officer's right to make a protective search of the truck for weapons. 148 F.Appx. at 476.

If *Gant* also overrules *Michigan v. Long* and *United States v. Wynn,* and the rationale of those two cases, then these officers were not entitled to search defendant's car for the weapon they virtually knew to be present, simply because defendant was incapable of reaching that weapon. Hopefully *Gant* will not be so construed, since to do so will encourage officers at the scene to intentionally leave a defendant in proximity to the passenger compartment of his vehicle and any weapon therein simply to justify a search of the passenger compartment under *Gant*, a potential result recognized by the dissent in *Gant*. *Id*. at 1730.

Also, in this era when automobiles are ubiquitous, a *Terry*-search of an automobile is substantially the equivalent to a *Terry*-search and frisk of an individual; the passenger car from which a *Terry*-suspect has been removed is but an extension of the person himself.

A *Terry*-search of the interior of defendant's car for weapons was appropriate in light of all the circumstances then known to these officers under the authority of *Michigan v. Long, supra.*

> III. THE INVENTORY SEARCH OF THIS AUTOMOBILE, COUPLED WITH THE INEVITABLE DISCOVERY DOCTRINE, RENDERS MOOT ALL OTHER ISSUES

As mentioned earlier in this report, defendant's refusal to stop for Officer McElroy's blue lights and siren constituted a Class E felony in Tennessee. His immediate custodial

arrest for that offense was appropriate. Inasmuch as defendant was to be taken to the Washington County Detention Center, it was necessary that defendant's vehicle be towed from the scene, which it was.

These officers could not have merely abandoned defendant's car at the intersection of Millard and Earl Streets in Johnson City. First, it would have significantly interfered with the flow of traffic and posed a hazard. Second, it could have been stolen or vandalized. For either or both of these reasons, the police were obligated to tow the vehicle to a place of safety, the impound lot of the police department. Since the car was to be in the custody and presumed safekeeping of the police department, an inventory search was necessary to protect the police from future claims by the defendant that his property within that car was stolen while it was in the custody of the police department. *See, e.g., Florida v. Wells*, 495 U.S. 1 (1990). Any inventory search of this vehicle would have led to the inevitable discovery of the handgun in the glove box, and the box of .45 caliber ammunition on the floorboard. Under the Inevitable Discovery Doctrine, evidence that was initially seized improperly nevertheless may be admitted into evidence if it would have ultimately been discovered by proper means. *See, Nix v. Williams*, 467 U.S. 431 (1984); *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001).

**CONCLUSION**

In the opinion of this magistrate judge, any or all of the foregoing reasons supported the search of defendant's car, and there was no violation of the Fourth Amendment. Admittedly, the last reason - an inventory search and the Inevitable Discovery Doctrine -

renders academic all the other reasons.

It is respectfully recommended that defendant's motion to suppress, (Doc. 17), be denied.[5]

Respectfully submitted,

                                                    s/ Dennis H. Inman
                                            United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).